<u>Case No. 25-2186</u>

UNITED STATES COURT OF APPEALS
<u>FOR THE SIXTH CIRCUIT</u>

NICHOLAS CORY PLUG

Plaintiff-Appellant

v

VAN BUREN COUNTY, MI, a corporate subunit of Government, in their
Official capacities; SHERIFF DANIEL ABBOTT, in his individual and official
capacities; DEPUTY DILLON KELLY, in his individual and official capacities;
NURSE ROSLYNN HICKMOTT, in her individual and official capacities

Defendants-Appellees

Appeal from the United States District Court
Western District of Michigan
<u>Case No. 1:23-cv-01055</u>

**DEFENDANTS-APPELLEES VAN BUREN COUNTY, MI, SHERIFF
DANIEL ABBOTT, DEPUTY DILLON KELLY
AND NURSE ROSLYNN HICKMOTT'S
BRIEF ON APPEAL**

JOSEPHINE A. DELORENZO
Plunkett Cooney
38505 Woodward Ave, Suite 100
Bloomfield Hills, MI 48304
Tel: (313) 983-4338
jdelorenzo@plunkettcooney.com

*Attorneys for Defendants-Appellees*
*Van Buren County, MI, Sheriff Daniel Abbott, Deputy Dillon Kelly*
*and Nurse Roslynn Hickmott*

## CORPORATE DISCLOSURE

Pursuant to Sixth Circuit Rule 26.1, Defendants-Appellees, Van Buren County, MI, Sheriff Daniel Abbott, Deputy Dillon Kelly, and Nurse Roslynn Hickmott make the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?

No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

DATED: April 21, 2026                    /s/*Josephine A. DeLorenzo*
                                          Josephine A. DeLorenzo

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE ...........................................................................I

TABLE OF AUTHORITIES ..........................................................................III

STATEMENT REGARDING ORAL ARGUMENT ............................................. VI

COUNTER-STATEMENT OF THE QUESTIONS PRESENTED .............................1

COUNTER-STATEMENT OF THE CASE .........................................................2

    A.    Introduction ..................................................................2

    B.    Material Facts ................................................................3

    C.    Course of Proceedings....................................................6

        1.    Defendants moved for summary judgment.................................6

        2.    The magistrate judge recommended partial summary judgment.........................................................................8

        3.    The parties raised objections........................................11

COUNTER-STATEMENT OF THE STANDARD OF REVIEW ..............................15

SUMMARY OF THE ARGUMENT ................................................................16

ARGUMENT I ........................................................................................19

    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE INDIVIDUAL DEFENDANTS BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO A SERIOUS MEDICAL NEED, AND IN THE ALTERNATIVE, THEY WERE ENTITLED TO QUALIFIED IMMUNITY. .................................. 19

    A.    Plug's claims against Deputy Kelly, Sherriff Abbott, and the County are not preserved for appeal. ..................................20

    B.    In any event, the individual Defendants did not violate the Fourteenth Amendment. ...............................................21

        1.    Plug cannot satisfy the objective component............................21

        2.    Plug cannot establish the subjective component. ......................24

            a.    Deputy Kelly.............................................................26

            b.    Nurse Hickmott..........................................................29

    C.    In the alternative, Deputy Kelly and Nurse Hickmott are entitled to qualified immunity. .........................................33

i

ARGUMENT II ...............................................................................................44

        THE DISTRICT COURT PROPERLY GRANTED SUMMARY
        JUDGMENT OF THE MUNICIPAL LIABILITY CLAIMS. ......................... 44

    A.    The County does not have an unconstitutional policy. ........................45

    B.    The County is not liable for a failure to train.....................................48

        1.    Nurse Hickmott .........................................................................49

        2.    Deputy Kelly .............................................................................51

CONCLUSION ...............................................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM – DESIGNATION OF RELEVANT DISTRICT COURT
DOCUMENTS

TABLE OF AUTHORITIES

## Cases

*Alman v. Reed*,
703 F.3d 887 (6th Cir. 2013)........................................................................44

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................15

*Balimunkwe v. Bank of Am., N.A.*,
No. 16-3263, 2017 WL 4216586 (6th Cir. Jan. 17, 2017) ...................................20

*Binay v. Bettendorf*,
601 F.3d 640 (6th Cir. 2010) ........................................................................24

*Blackmore v. Kalamazoo Cnty.*,
390 F.3d 890 (6th Cir. 2004)........................................................................21

*Brawner v. Scott Cnty., Tennessee*,
14 F.4th 585 (6th Cir. 2021)................................................... 25, 46, 51

*Britt v. Hamilton County*,
2022 WL 405847 (6th Cir. Feb. 10, 2022)............................. 29, 30, 35

*Burgess v. Fischer*,
735 F.3d 462 (6th Cir. 2013) ........................................................................44

*Castro v. County of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016)......................................................................25

*Ciminillo v. Streicher*,
434 F.3d 461 (6th Cir. 2006) ........................................................................34

*Connick v. Thompson*,
563 U.S. 51 (2011) ......................................................................................48

*Dickerson v. McClellan*,
101 F.3d 1151 (6th Cir. 1996).......................................................................15

*Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty.*
*Bd. of Educ.*,
103 F.3d 495 (6th Cir. 1996).........................................................................25

*Essex v. Cnty. of Livingston*,
518 F. App'x 351 (6th Cir. 2013).....................................................................25

*Est. of Carter v. City of Detroit*,
408 F.3d 305 (6th Cir. 2005).................................................... 40, 42, 43

*Farmer v. Brennan*,
511 U.S. 825 (1994) ................................................................ 21, 25

*Franklin v. Franklin Cnty., Kentucky*,
115 F.4th 461 (6th Cir. 2024) ...................................................45

*Graham ex rel. Estate of Graham v. County of Washtenaw*,
358 F.3d 377 (6th Cir. 2004) ............................................... 46, 48

*Greene v. Crawford Cnty., Michigan*,
22 F.4th 593 (6th Cir. 2022) ........................... 22, 24, 25, 26, 35, 42, 43

*Grote v. Kenton Cnty., Kentucky*,
85 F.4th 397 (6th Cir. 2023) ................................. 22, 38, 39, 43, 54

*Helphenstine v. Lewis Cnty., Kentucky*,
60 F.4th 305 (6th Cir. 2023) ................................. 14, 21, 49, 54

*Howard v. Secretary of Health and Human Servs.*,
932 F.2d 505 (6th Cir.1991) ...................................................20

*Howell v. NaphCare, Inc.*,
67 F.4th 302 (6th Cir. 2023) ................................. 14, 29, 35, 39, 40, 43

*Johnson v. Karnes*,
398 F.3d 868 (6th Cir. 2005) ...................................................22

*Medley v. Shelby Cty.*,
742 F. App'x 958 (6th Cir. 2018) ...........................................46

*Meirs v. Ottawa Cnty.*,
821 F. App'x 445 (6th Cir. 2020) ...........................................49

*Mercer v. Athens Cnty., Ohio*,
72 F.4th 152 (6th Cir. 2023) ..................................... 36, 37, 43

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658 (1978) ...........................................................6, 44

*Morgan v. Fairfield Cnty.*,
Ohio, 903 F.3d 553 (6th Cir. 2018) .........................................44

*Ouza v. City of Dearborn Heights, Michigan*,
969 F.3d 265 (6th Cir. 2020) ...................................................48

*Perez v. Oakland Cnty.*,
466 F.3d 416 (6th Cir. 2006) ...................................................30

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ...............................................................34

*Reichle v. Howards*,
132 S. Ct. 2088 (2012) ....................................................................33

*Rouster v. Cnty. of Saginaw*,
749 F.3d 437 (6th Cir. 2014) ............................................ 29, 30, 35

*Russo v. City of Cincinnati*,
953 F.2d 1036 (6th Cir. 1991) .........................................................19

*Santiago v. Ringle*,
734 F.3d 585 (6th Cir. 2013) ...........................................................33

*Shadrick v. Hopkins Cnty.*,
805 F.3d 724 (6th Cir. 2015) ...........................................................49

*Smith v. Chater*,
121 F.3d 709 (6th Cir. 1997) ...........................................................20

*Spears v. Ruth*,
589 F.3d 249 (6th Cir. 2009) ..................................................... 21, 24

*Thomas v. Arn*,
474 U.S. 140 (1985) ........................................................................20

*United States v. Diebold, Inc.*,
369 U.S. 654 (1962) ........................................................................15

*United States v. Walters*,
638 F.2d 947 (6th Cir. 1981) ...........................................................20

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
714 F.3d 414 (6th Cir. 2013) ...........................................................15

*White v. Pauly*,
580 U.S. 73 (2017) ..........................................................................34

*Whyde v. Sigsworth*,
 No. 22-3581, 2024 WL 4719649 (6th Cir. Nov. 8, 2024)................54

*Winkler v. Madison Cnty.*,
893 F.3d 877 (6th Cir. 2018) ...........................................................46

## **Statutes**

42 U.S.C. § 1983 ................................................................... 19, 24, 44

## **Rules**

Fed. R. Civ. P. 56(a)..........................................................................15

Sixth Circuit Rule 34(a)(2) ............................................................... vi

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a)(2), Defendants-Appellees, Van Buren County, MI, Sheriff Daniel Abbott, Deputy Dillon Kelly, and Nurse Roslynn Hickmott, request that the Court docket this appeal for oral argument. Oral argument will afford counsel the opportunity to address any questions that the Court may have concerning the lower court record and the specifics of the parties' respective positions on appeal. It is Defendants-Appellees' belief that oral argument is necessary, will be beneficial for all involved, and that the decisional process will be significantly aided by this Court's allowance of oral argument.

**COUNTER-STATEMENT OF THE QUESTIONS PRESENTED**

DID THE DISTRICT COURT PROPERLY GRANT SUMMARY JUDGMENT TO THE INDIVIDUAL DEFENDANTS BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO A SERIOUS MEDICAL NEED, AND IN THE ALTERNATIVE, BECAUSE THEY ARE ENTITLED TO QUALIFIED IMMUNITY?

DID THE DISTRICT COURT PROPERLY GRANT SUMMARY JUDGMENT OF THE MUNICIPAL LIABILITY CLAIMS?

## A. Introduction

This appeal arises out of Plaintiff-Appellant, Nicholas Plug's, detention in Defendant-Appellee Van Buren County's jail. When he arrived at the jail on October 5, 2020, Plug indicated he had taken methamphetamine the day before and showed signs of being under the influence. He also complained of covid symptoms. Defendant-Appellee Deputy Dillon Kelly noted this information on Plug's booking form, which is reviewed by medical staff. Over the next 11 days, Defendant-Appellee Rosalynn Hickmott, the jail nurse on duty, monitored Plug's symptoms as needed – his covid test came back negative but he had an elevated blood pressure rate. Nurse Hickmott did not observe any other cause for concern. On October 16, 2020, when Deputy Kelly was making his rounds, he saw that Plug was having a medical issue and Plug was sent to the hospital where it was determined he had had a stroke.

Plug subsequently brought a two-count complaint alleging deliberate indifference to a serious medical need against Nurse Hickmott, Deputy Kelly, and Defendant-Appellee Sheriff Daniel Abbott, and asserting municipal liability against Sheriff Abbot and the County for unconstitutional policies and a failure to train.

This Court should affirm the district court's order granting summary

judgment to Defendants. The individual Defendants were not deliberately indifferent to a serious medical need because Plug received appropriate monitoring of his symptoms and when those symptoms escalated, he was sent to the hospital. In the alternative, Defendants are entitled to qualified immunity because existing precedent does not provide notice that their conduct violated Plug's clearly established constitutional rights. Additionally, the municipal liability claims fail as a matter of law because it is not unconstitutional for the County to rely on medical judgments made by private medical professionals. Plug's failure to train claim was also correctly dismissed because the nursing staff and corrections officers were properly trained to respond to medical emergencies.

## B. Material Facts

Deputy Kelly was a corrections officer working the booking desk at the County's jail on October 5, 2020. (R 65-1, Batch Book Form, PageID.445). The Batch Book Form noted Plug appeared to be under the influence of alcohol or drugs or had visible signs of withdrawal. (*Id*.). According to the form, Plug indicated only one existing medical condition: his use of methamphetamine. (*Id.*, PageID.449). Plug answered "no," when asked if he had a problem when he stopped using drugs or alcohol. (*Id*.) In his deposition, however, Plug stated he was being treated for high blood pressure and had a prescription for that condition. (R 65-2, Plug Deposition, p 12 PageID.454). A covid questionnaire filled out at

the time of booking also noted Plug had covid symptoms and believed he had been

exposed to covid.  (R. 69-2 PageID.578; R. 65-2, Plug Dep, p 15 PageID.455).

Nurse Hickmott, who has worked at the Van Buren County jail for more than

two decades, documented Plug's progress following the initial intake as follows:

> 10/9/2020: *c/o [complaining of] cough, SOB [short of breath] when laying down.  Inmate is a large man. Skin warm + dry.  Covid test done on inmate.  Looked up symptoms before coming to jail – concerned.  Does not know if he was in contact with anyone.  Sick 2-3 days before coming to jail – Dry cough.  O2 sat 94% pulse 98.  No nasal discharge – no body aches – eating well – not much fluids – encouraged to increase fluids.*
>
> 10/14/2020: *Spoke with inmate informed him of his test results (Covid negative) – mumbled some words.  Some words clear.  Denies pain. Easts all meals.  Walks in cell gets self up off the floor.  Moves arms + legs well.  Skin warm + dry – resp easy no coughing noted.  Seems alert – but won't talk when spoken too [sic].  Follows commands when asked. 02 sat 99%.  Pulse 65.  BP 142/100.*
>
> 10/15/2020: *Alert – responds to verbal commands – speaks some words clear + correct – mumbles some makes eye contact.  Moves all extremities ate breakfast + lunch most of it, but only a little dinner. Sleeping most of the day but wakes up + responds when spoken too [sic].  Clear lung sounds noted bil [bilateral] lungs.  Laying on matt on the floor.  97/6. 140/98. Pulse 85. 02 sat 99%.*
>
> 10/16/2020: *This writer informed by Sgt. Griffin they were sending inmate to ER & wanted medical to call ... hospital.  This writer called Bronson Paw Paw ER & spoke w/Shannon RN.*

(R. 65-3, Nurse Progress Notes, PageID.469-471; R 65-4, Hickmott Dep, pp 64-65,

67-68, PageID.488-489).

According to Nurse Hickmott, in her interactions with Plug, he denied any kind of pain, ate his meals, was walking in his cell, had easy respirations, had warm and dry skin, and would selectively answer when spoken to directly. (R. 65-4, Deposition of Roslynn Hickmott, pp 67-68 PageID.489). Plug testified that he does not recall these interactions, saying that "maybe" his blood pressure was taken, but all he really remembers was "eating most of my meals." (R. 65-2, Plug Dep, pp 19-20 PageID.456).

Due to the on-going pandemic, Plug was first held in an observation cell in the booking area for seven days and checked on when the deputies made their rounds. (R. 65-6, Kelly Dep, pp 20-21, 57-58 PageID.502-503, 512). Plug had three meals a day delivered to him by corrections officers. (R. 65-2, Plug Dep, p 17 PageID.455). Plug states that he "really wasn't talking" to those coming to his cell, that he "was trying to get out of jail." (*Id*.).

Deputy Kelly testified that Plug spoke to him on October 16, 2020, complaining of an illness. Deputy Kelly removed Plug from his cell and after talking to him, "realized there was a medical issue." (R. 65-5, Kelly Dep., pp 77-78 PageID.517). When he could not reach his supervisor, Deputy Kelly contacted the on-call doctor and indicated that Plug needed to go to the hospital. (*Id*.)

Plug was initially taken to Bronson Lakeview Hospital where he presented as aphasic. (R. 1, Complaint, ¶ 20 PageID.9). Plug was diagnosed with possible

pneumonia, acute ischemic left MCA stroke, methamphetamine abuse, aphasia, systolic dysfunction and diastolic dysfunction. (*Id*., ¶ 33, PageID.9). Plug was subsequently transferred to Bronson Methodist Hospital in Kalamazoo for further evaluation and was released on bond. (*Id*., ¶ 35 PageID.9).

Plug continued to receive treatment at Bronson Methodist Hospital for two weeks and thereafter received two weeks of rehabilitation at Mary Free Bed Rehabilitation Hospital. (R. 65-2, Plug Dep, p 29 PageID.458). Plug had no further treatment. (*Id*., p 30 PageID.458). He eventually entered a plea deal related to the manufacturing of methamphetamine. (*Id*., p 10).

## C.     Course of Proceedings

### 1.     Defendants moved for summary judgment.

Plug filed a two-count complaint in October of 2023 alleging "Federal Constitutional Violations Eighth Amendment" for "deliberately denying Plaintiff medical attention to his obvious serious medical needs in a reasonably foreseeable time," and "Violation of Federal Rights – *Monell* Liability" against the County and Sheriff Abbott for a failure to train and policies that, among other things, denied incarcerated individuals adequate and timely medical care. (R 1, Complaint, PageID.1-15).

After discovery closed, Defendants moved for summary judgment, first arguing that the Eighth Amendment did not apply to this case, rather, the

Fourteenth Amendment applies to pretrial detainees. (R. 65, Motion for Summary Judgment, PageID.421-425). Defendants next contended that even under the Fourteenth Amendment, Plug's claims fail because, first, he could not establish a sufficiently serious medical need; he could not point to anything in the record that established when he had the stroke, and when he did show signs that indicated distress, he was transported to the hospital. (*Id*., PageID.427).

Defendants also argued that Plug could not show the individual Defendants acted both deliberately and recklessly in the face of an unjustifiably high risk of harm because Plug was medically evaluated every day and, again, when there was a sign of a problem, he was taken to the hospital. (R. 65, Motion for Summary Judgment, PageID.429). Defendants further asserted that the individual Defendants were entitled to qualified immunity in any event. (*Id*., PageID.432-434).

As to the municipal liability claim, Defendants argued that since Plug could not demonstrate a constitutional violation, his claim failed. (R. 65, Motion for Summary Judgment, PageID.436-437). Defendants next contended that, regardless, there was no policy or custom of constitutional deprivation and Plug incorrectly asserted that the County lacked a policy of assessing inmates at booking for serious medical needs or a policy to observe inmates who exhibit obvious signs of illnesses. (*Id*., PageID.441-442).

7

Plug opposed Defendants' motion, first arguing under the Fourteenth Amendment that strokes and drug overdoses qualify as "objectively serious," medical needs and he was displaying such symptoms when he was booked at the jail. (R. 69, Response, PageID.540-541). Plug next contended that Deputy Kelly was not entitled to qualified immunity because he ignored Plug's obvious, visible signs of serious medical distress, despite having been trained to recognize them. (*Id.*, PageID.543-544). Plug argued that Sheriff Abbott was not entitled to qualified immunity because a jury could find he failed to implement or enforce any meaningful procedures for identifying and responding to medical emergencies, especially those related to methamphetamine intoxication. (*Id.*, PageID.545-546). As to Nurse Hickmott, Plug argued she, among other things "repeatedly declined to escalate care" in light of allegedly worsening symptoms. (*Id.*, PageID.448-551).

Plug next argued the County was liable because the constitutional violations at issue were the result of official policies, practices, or customs that permitted, encouraged, or failed to prevent systemic medical neglect in the jail. (R. 69, Response, PageID.551). Plug further contended there was a failure to train and supervise jail staff and Nurse Hickmott. (*Id.*, PageID.551-555).

### 2. The magistrate judge recommended partial summary judgment.

After Defendants filed their reply brief (R. 72, PageID.976-990), the magistrate judge issued a Report and Recommendation ("R&R") recommending

that summary judgment be granted as to Deputy Kelly, Sheriff Abbott, and the County, but denied as to Nurse Hickmott. (R. 75, R&R, PageID.999-1028).

The judge agreed that Plug's claim fell under the Fourteenth Amendment because he was a pretrial detainee and that he adequately pleaded such a claim. (R. 75, R&R, PageID.1004). The judge explained that as to Deputy Kelly's two encounters with Plug, Deputy Kelly observed Plug in obvious distress, and therefore, "a genuine issue of material fact exists regarding whether Deputy Kelly was aware that Plug presented with a serious medical need on those dates." (*Id*., PageID.1011-1012). As to deliberate indifference, however,

> Deputy Kelly did not act recklessly … when acting as the booking officer, Deputy Kelly recorded Plug's symptoms and placed him in an observation cell. And, on October 16, 2020, while performing rounds in the jail, Deputy Kelly spoke with Plug after he told him he was not feeling well, called the jail doctor after he was unable to contact his supervisor, and recommended that Plug should be taken to the hospital. Under these circumstances, there exists no genuine issue of material facts on the subjective element .… Deputy Kelly acted appropriately ….

(R. 75, R&R, PageID.1012-1013). Accordingly, Deputy Kelly was entitled to qualified immunity because "[t]here is no evidence in the record which could show that Deputy Kelly violated clearly established law." (*Id*., PageID.1021-1022).

As to Nurse Hickmott, however, the judge determined there was a question of fact regarding whether she was deliberately indifferent to a serious medical need:

9

> Nurse Hickmott …was at least aware that [Plug] was withdrawing from methamphetamine, and had elevated blood pressure readings, was mumbling, unresponsive, sleeping most of the day by October 15, and not eating all his meals. In the opinion of the undersigned, Nurse Hickmott was aware that Plug had a serious medical need or should have been aware of that need. Additionally, a reasonable jury could conclude that Plug was in distress and needed medical intervention "that only a hospital could provide" …. Further, a jury could conclude that the treatment Nurse Hickmott provided was "so cursory as to amount to no treatment at all." ... This conclusion is consistent with Plug's expert medical witness … whose expert opinion is that if Plug was taken to the hospital earlier as soon as October 14, 2020, he could have been treated with "more invasive treatments, potentially reversing some or all of his aphasia symptoms."

(R. 75, R&R, PageID.1018-1019). The judge also ruled that Nurse Hickmott was not entitled to qualified immunity and thus summary judgment should be denied.

(*Id*., PageID.1022)

Next addressing the municipal liability claims against the County and Sheriff Abbott in his official capacity, the judge first observed that "Plug failed to identify a policy or procedure that was implemented by Van Buren County that violated his rights." (R. 75, R&R, PageID.1024). Additionally, to the extent that Plug's claim was based on an alleged failure to require individuals undergoing drug withdrawal symptoms to be housed in detox cells, Plug "failed to show how he was harmed by the lack of a detox cell." (*Id*., PageID.1025). As to the allegations of a failure to train or supervise, or implement proper policies, there was no evidence of other similar alleged violations, and therefore, Plug could succeed only "by showing that a single violation – his stroke and subsequent symptoms – were

caused by the failure to train … on recurring situations involving drug withdrawal." (*Id*., PageID.26). The judge determined Plug failed to establish the necessary elements:

> Plaintiff has presented no evidence showing that a medical professional was not present at the jail at the time he suffered his stroke or first exhibited stroke symptoms. … Moreover, when Defendant Kelly spoke with Plaintiff on October 16, he noticed that Plug was in medical distress and telephoned the jail doctor to obtain approval to send Plug to the hospital. Therefore, Plug has not established that the county's jail staff training was inadequate for circumstances where no medical staff are present in the jail. Jail staff could telephone a doctor and obtain approval to send an inmate to the hospital. This is exactly what Defendant Kelly did in this case.

(R. 75, Report, at PageID.1027).

### 3. The parties raised objections.

Defendants and Plug each filed objections to the Report and Recommendation. (R. 76, Defendants' Objections to R&R, PageID.1029-1037; R. 78, Plaintiff's Objections to R&R, PageID.1039-1049). The district court subsequently issued an Order Regarding Report and Recommendation, adopting in part and rejecting in part the magistrate judge's decision. The court first explained its agreement:

> The Court accepts and adopts the Magistrate Judge's recommendation to grant summary judgment to Defendants Kelly, Abott, and Van Buren County. In the Report and Recommendation, the Magistrate Judge recommends granting summary judgment to Defendant Kelly because he is entitled to qualified immunity. Additionally, the Magistrate Judge recommends granting summary judgement to Sheriff Abott, who is being sued in his official capacity for a failure to train,

11

because Plaintiff failed to show a pattern of constitutional violations committed by employees …. And finally, the Magistrate Judge recommends granting summary judgment to Van Buren County because Plaintiff has failed to identify a policy or custom of the county that caused Plaintiff's constitutional rights to be violated.

(R. 80, Order, PageID.1056-1057). The district court also observed that in Plug's

objections, he "primarily reiterates and expands upon arguments presented in the

original complaint. Plaintiff's objections fail to deal in a meaningful way with the

Magistrate Judge's analysis." (*Id*., PageID.1057)

As to Nurse Hickmott, however, the district court ruled that a reasonable fact

finder could not "conclude that Defendant Hickmott acted with the subjective

mental state required for a Fourteenth Amendment deliberate indifference claim."

(R. 80, Order, PageID.1057). Further, "the evidentiary record does not suggest that

Nurse Hickmott violated a clearly established constitutional right." (*Id*.).

Specifically, the district court determined that Nurse Hickmott's notes demonstrate

she was "thorough in her evaluations. She regularly monitored the plaintiffs'

vitals, attempted to speak with him during each interaction, and inquired about

whether he was eating or drinking." (*Id*., PageID.1059). The court reasoned:

Some of these notes reflect symptoms that are worrying, such as mumbling, refusing to speak when addressed, or sleeping throughout much of the day. Most of the notes, however, show that Plaintiff was doing quite well—he was not experiencing pain, he was eating most of his meals, and he was following commands. And his blood pressure, though high, was not outside of the range one might expect for a man of heavy build who is withdrawing from methamphetamine consumption.

(*Id*., PageID.1059-1060).

The district court also explained that, while the magistrate judge relied on hospital notes stating Plug had been urinating on himself, this was inadmissible hearsay because "[t]he hospital staff based their notes on statements that were allegedly made to them by the prison officials who accompanied Plaintiff to the hospital." (R. 80, Order, PageID.1060). Regardless,

> Even if these notes were admissible … they would still be insufficient to show that Nurse Hickmott was aware Plaintiff had urinated on himself. … [I]t is apparent that the hospital's notes about the patient urinating on himself referred only to events that had begun to occur within the past day or so. Such notes are consistent with the jail staff's assertions that they noticed a significant change in Plaintiff's behavior on the morning they sent him to the hospital. Thus, … the notes underscore that until shortly before bringing the plaintiff to this hospital, his symptoms were consistent with what one would expect from a person suffering from methamphetamine withdrawal.

(*Id*.)  The district court also noted that unlike many cases where a constitutional violation was found, Plug "had a nurse monitoring him regularly after he was first booked.  Then, shortly after jail staff first saw a significant change in Plaintiff's behavior, they brought him to a hospital. … [E]ven the hospital notes indicate that there was no reason to expect stroke to strike an otherwise healthy 35-year-old man." (*Id*., PageID.1060-1061).

> In sum:

> [N]one of the evidence suggests that Nurse Hickmott was ignoring Plaintiff's condition.  On the contrary, she was frequently evaluating

his condition and making medical determinations in response to her findings. Even if those determinations were wrong in hindsight, such mistakes fail to rise to the level of a constitutional violation.

(R. 80, Order, PageID.1061).

The district court further held that Nurse Hickmott was entitled to qualified immunity, distinguishing the facts from the cases upon which Plug relied, *Helphenstine v. Lewis Cnty., Kentucky,* 60 F.4th 305, 312 (6th Cir. 2023) and *Howell v. NaphCare, Inc.*, 67 F.4th 302, 308 (6th Cir. 2023). Unlike the plaintiffs in those case, Plug "was responsive, alert, and reporting little pain or discomfort. … The record does not show that Defendant Hickmott was on notice before the day Plaintiff went to the hospital of a risk of stroke or other serious medical problem requiring hospitalization." (*Id*., PageID.1062-1063).

Plug now brings this appeal.

**COUNTER-STATEMENT OF THE STANDARD OF REVIEW**

This Court reviews de novo a grant of summary judgment, including one based on qualified immunity. *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 418 (6th Cir. 2013); *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in the nonmovant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

Preliminarily, Plug's claims against Deputy Kelly, Sherriff Abbott, and the County are not preserved for appeal because his objections to the Report & Recommendation merely summarized his arguments made in response to the motion for summary judgment. This Court has held that a general objection that fails to specify the issues of contention does not satisfy the requirement that an objection be filed, and this failure waives the right to appeal.

In any event, the district court properly granted summary judgment to Nurse Hickmott and Deputy Kelly because they were not deliberately indifferent to a serious medical need. Plug cannot satisfy either the objective or subjective component of this claim.

Plug's medical need was not sufficiently serious within the meaning of the objective prong, where "obviousness" is a key factor. While Defendants knew that Plug thought he had covid, and further, that he was under the influence of methamphetamine, there were no obvious signs of something more serious. Plug cannot point to anything in the record to show that he exhibited a specific symptom at a specific time that should have been noticed but was not. The record instead shows that when he exhibited more serious symptoms, he was sent to the hospital.

Regardless, the district court correctly concluded that Plug cannot meet the subjective prong of his claim. As to Deputy Kelly, this Court has held a non-

16

medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions. Here, in both instances where Deputy Kelly was made aware of Plug's medical needs, he deferred to medical professionals. At booking, Deputy Kelly knew the booking form would be reviewed by the medical staff and Plug would undergo a medical evaluation, and on October 16, Deputy Kelly consulted with the jail doctor and determined that Plug should be sent to the hospital. Therefore, Deputy Kelly did not act recklessly in the face of an unjustifiably high risk that is either known or so obvious that it should be known.

Nurse Hickmott likewise did not intentionally ignore or recklessly fail to act reasonably to mitigate the risk of Plug's medical needs. Rather, the record establishes that Nurse Hickmott carefully monitored Plug's symptoms and appropriately addressed them. There is nothing in the record to demonstrate that Plug was exhibiting symptoms that were entirely consistent with a stroke alone or that Hickmott possessed any additional information about Plug that should have informed her decisions on how to treat him.

In the alternative, Deputy Kelly and Nurse Hickmott are entitled to qualified immunity. Precedent from this Court establishes that any misdiagnosis by Nurse Hickmott amounts to mere negligence not a constitutional violation, and further, that it is constitutional for Deputy Kelly to defer to medical staff. The case law

17

upon which Plug relies involves jail nurses or corrections officers who disregarded obvious severe symptoms or had some knowledge regarding the detainee's serious condition. Those cases do not place the constitutional question confronted by Deputy Kelly and Nurse Hickmott beyond debate.

The district court also properly granted summary judgment of the municipal liability claims. Any claim based on a custom or policy of inaction in denying proper medical care to detainees suffering from withdrawal fails as a matter of law because there is no pattern of similar violations in the County jail. Moreover, the policy the County has implemented is constitutional. This court has made clear that it is not unconstitutional for municipalities to rely on medical judgments made by private medical professionals responsible for prisoner care.

Finally, Plug cannot succeed on his failure-to-train claim because the nursing staff and corrections officers were trained to respond to medical emergencies. Hickmott was trained to address drug withdrawal and signs of stroke. Here, she carefully monitored Plug's symptoms and never observed anything that required additional medical intervention. Deputy Kelly was properly trained to obtain medical information from detainees at booking, and to otherwise defer to the medical staff for proper treatment. When he observed troubling symptoms in this case, he contacted the on-call doctor and ensured that Plug was sent to the hospital.

## ARGUMENT I

**THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE INDIVIDUAL DEFENDANTS BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO A SERIOUS MEDICAL NEED, AND IN THE ALTERNATIVE, THEY WERE ENTITLED TO QUALIFIED IMMUNITY.**

To state an actionable claim under 42 U.S.C. § 1983, a plaintiff must establish that (1) he was deprived of a right established by the constitution or a federal law and (2) the defendants, acting under color of law, caused the deprivation. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1991). Here, there is no dispute that Defendants were acting under color of law when they came in contact with Plug during his detention at Van Buren County Jail. With respect to the second element, Plug argues that the individual Defendants violated his Fourteenth Amendment right to not have a serious medical need disregarded, which led to him suffering a stroke. The district court correctly granted summary judgment to the individual Defendants because they were not deliberately indifferent to a serious medical need, rather, Plug received appropriate monitoring of his symptoms and when those symptoms escalated, he was sent to the hospital. In the alternative, Defendants are entitled to qualified immunity because there is no clearly established law putting them on notice that their conduct in these circumstances violates the constitution.

19

**A.    Plug's claims against Deputy Kelly, Sherriff Abbott, and the County are not preserved for appeal.**

Preliminarily, as the district court observed, in Plug's objections to the parts of the Report and Recommendation recommending summary judgment for Deputy Kelly, Sheriff Abbott, and the County, Plug "primarily reiterates and expands upon arguments presented in the original complaint," and therefore, Plug's objections "fail[ed] to deal in a meaningful way with the Magistrate Judge's analysis." (R. 80, PageId.1057). Indeed, the objections merely summarized Plug's arguments and did not reference any specific part of the Report and Recommendation. (R. 78, Plaintiff's Objections, PageID.1039-1050).

> This Court has held that
>
> When objecting to the report of a magistrate, a general objection which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious.

*Smith v. Chater*, 121 F.3d 709 (6th Cir. 1997) (citations and punctuation omitted). Accordingly, "[a] general objection to the entirety of the magistrate's report has the same effects as would a failure to object." *Howard v. Secretary of Health and Human Servs.,* 932 F.2d 505, 509 (6th Cir.1991). This failure to object waives the right to appeal. *Balimunkwe v. Bank of Am., N.A.*, No. 16-3263, 2017 WL 4216586, at *2 (6th Cir. Jan. 17, 2017), citing *United States v. Walters*, 638 F.2d 947, 949-51 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 155 (1985). Therefore,

Plug has waived his right to appeal the district court's ruling as to Deputy Kelly, Sheriff Abbott, and the County.

**B.     In any event, the individual Defendants did not violate the Fourteenth Amendment.**

"Pretrial detainees have a right under the Fourteenth Amendment to adequate medical treatment, a right that is analogous to the right of prisoners under the Eighth Amendment." *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) (citation omitted). "The Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (citations and quotation marks omitted). "A constitutional claim for denial of medical care has objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). Plug cannot satisfy either requirement.

**1.     Plug cannot satisfy the objective component.**

To meet the objective component, the plaintiff must show that the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As this Court has recently explained, "[t]he objective component addresses the conditions leading to the alleged violation: it requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 315 (6th Cir.

2023) (citations and punctuation omitted). "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 607 (6th Cir. 2022) (citation and punctuation omitted).

This Court has held "that drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen." *Grote v. Kenton Cnty., Kentucky,* 85 F.4th 397, 406 (6th Cir. 2023). Here, however, while Defendants knew that Plug thought he had covid, and further, that he was under the influence of methamphetamine, Plug stated he did not have problems with withdrawal. Moreover, there were no *obvious* signs of something more serious like in *Grote*, where, when the detainee was booked, he was "unable to complete booking paperwork while in presence of various officers, due to persistent twitching," and during his initial medical assessment, "[h]e was covered in sweat, … shaking so much that [the nurse] could not take all of his vital signs," and he began to hyperventilate. *Id*. at 407.

Similarly, any signs of a stroke were not obvious. Where there are "non-obvious complaints of a serious need for medical care, the inmate must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005)

(citation and punctuation omitted). Here, Plug relies on expert testimony stating that his stroke occurred on October 14, but there is no verifying medical evidence of symptoms that should have been observed yet were missed. Although Plug repeatedly emphasizes that he was urinating on himself, the district court correctly ruled that this was hearsay gleaned from the medical records from the day of the stroke. There is no evidence that Nurse Hickmott, Deputy Kelly, or anyone else observed this symptom – or other symptoms of stroke – before Plug was sent to the hospital, and in fact, the evidence is to the contrary.

Specifically, Nurse Hickmott evaluated Plug and took his vitals both days before he was transferred to the hospital. On October 15, 2020, Nurse Hickmott noted that Plug was able to wake up and respond when spoken to. (R. 65-3, Nurse Progress Notes, PageID.470). During Nurse Hickmott and Deputy Kelly's time with Plug, Plug did not appear to be in any immediate distress and did not complain. Plug himself stated that he was avoiding speaking to people. (R. 65-2, Plug Dep, p 17 PageID.455). Nurse Hickmott also noticed Plug was avoiding speaking with her except for direct questions that needed answers, mumbling other responses, and he seemed "angry, like, he didn't want to talk to medical." (R 65-4, Hickmott Dep, pp 43; 67-68 PageID.483, 489).

Plug cannot point to anything in the record to show that he exhibited a specific symptom at a specific time that should have been noticed but was not. In

fact, he concedes that an "officer" did notice a problem which is "why he took me to the hospital." (R. 65-2, Plug Dep., p 23 PageID.457). By his own account, the corrections staff noticed there was a medical issue that needed to be addressed at the hospital, which is further corroborated by Deputy Kelly's testimony of the events of October 16th. (R. 65-5, Kelly Dep, pp 77-78 PageID.517).

Finally, Plug's condition, which was not obvious to Nurse Hickmott after several medical evaluations, could not have been obvious to corrections officers with minimal to no medical training. See *Spears v. Ruth,* 589 F.3d 249, 255 (6th Cir. 2009) (rejecting the "obvious existence of a sufficiently serious medical need" when that need was not obvious to trained medical personnel). Accordingly, Plug's medical need was not sufficiently serious within the meaning of the objective prong, where "obviousness" is a key factor.

### 2. Plug cannot establish the subjective component.[1]

Even assuming Plug could meet the objective component of a deliberate indifference claim, the district court correctly concluded that he cannot meet the

---

[1] In a § 1983 action, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). See also *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 607 (6th Cir. 2022) (At the second prong, because we cannot "impute knowledge from one defendant to another[,]" we must "evaluate each defendant individually[.]"). Plug's brief on appeal does not separately address the claims against the individual Defendants.

subjective prong as to either Deputy Kelly or Nurse Hickmott.[2]  "To meet the subjective component, the plaintiff must show that an official knew of and disregarded an excessive risk to inmate health or safety."  *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021) (citation and punctuation omitted). Under this circuit's most recent precedent, to establish the subjective prong:

> Mere negligence is insufficient.  A defendant must have not only **acted deliberately (*not accidentally*)**, but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Farmer*, 511 U.S. at 836, 114 S.Ct. 1970 ….  A pretrial detainee must prove "more than negligence but less than subjective intent—**something akin to reckless disregard**."  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

*Id*. (emphasis added).  See also *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 607 (6th Cir. 2022) (citation omitted) ("to survive summary judgment on the subjective prong, a plaintiff must present evidence from which a reasonable jury could find "that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious

---

[2] The report and recommendation, adopted by the district court, correctly noted that the failure-to-train and unconstitutional policy claims asserted against Sheriff Abbott are official capacity claims that are properly treated as claims against the County.  (R. 75, R&R, PageID. 1025-1026, citing *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996); *Essex v. Cnty. of Livingston*, 518 F. App'x 351, at 355 (6th Cir. 2013)).  There are no allegations, let alone any evidence in the record, that Sheriff Abbott otherwise interacted with Plug and thus an individual claim against him cannot be sustained.

medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to the detainee.")

### a. Deputy Kelly

With respect to corrections officers like Deputy Kelly as distinguished from medical staff, this Court has held:

> In the Eighth Amendment context, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. Consistent with this principle, we have recognized that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions. … [W]hen an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice.

*Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 608 (6th Cir. 2022). Neither of Deputy Kelly's two interactions with Plug constitute an intentional disregard of Plug's serious medical needs nor a reckless failure to mitigate the risk of Plug's serious medical needs because he deferred to medical staff or otherwise appropriately responded.

Deputy Kelly's first interaction with Plug occurred on October 5, 2020, when, according to the Batch Book Form, Plug was working the booking desk. (R. 65-1, Batch Book Form, PageID.445). In answering questions that are part of the intake process, Plug stated he used methamphetamine and had last used it on

26

October 4, 2020. (*Id*., PageID.449). He also stated he did not have a problem when he stopped using the drug. (*Id*.).

Additionally, Deputy Kelly answered yes to the question on the booking form that asks the officer whether the detainee "appears to be under the influence of alcohol or drugs or has visible signs of withdrawal? (Extreme perspiration, pinpoint pupils, shakes, nausea, cramping, vomiting)." (R. 65-1, Batch Book Form, PageID.446). Deputy Kelly testified he could not recall if Plug was displaying all or some of the symptoms. (R 65-6, Kelly Dep, p 49 PageID.510). Plug also believed he had been exposed to Covid. (R. 62-5, Plug dep, p 15 PageID.455). Accordingly, a Covid Questionnaire indicated that Plug reported feeling feverish and having shortness of breath, diarrhea, and uncontrollable coughing. (R. 69-2, PageID.578). Importantly, Plug, like others who were booked in the jail during the pandemic, were held in observation cells in the booking area for seven days before being placed in general population. (R. 65-5, Kelly Dep, pp 20-21, 75 PageID.502-503, 516). While in that cell, Deputy Kelly would have monitored Plug every 15 minutes to half hour. (*Id*., p 32 PageID.505).

Deputy Kelly further explained that, generally, he logged the booking information (which here included that Plug was under the influence of methamphetamine) digitally and uploaded it, at which point he assumed it went to the medical team for their review. (R. 65-5, Kelly Dep., pp 21-22 PageID.503). If

an inmate had any medical issue "as small as a headache" or as large has having a heart attack, he would notify his supervisor and also the jail nurse or medical staff. (*Id.*, p 25, 27, 29-30 PageId.504-505).  He was also aware that "any inmate who came into the jail would automatically get a medical eval." (*Id.*, p 55 PageID.511).

On October 16, 2020, Plug complained to Deputy Kelly that he did not feel well, and Kelly sought medical attention:

> I remember, that night, he approached me as I was doing my rounds. He said he wasn't feeling right.  So I pulled him out of his cell, sat him outside the guard station, talked to him for a minute, tried to figure out what was going on, realized there was a medical issue, tried getting in touch with Sergeant Darue.  I didn't get ahold of Sergeant Darue; so I called the on-staff doctor.  And then the on-staff doctor said, "Does he need to go to the hospital?" I said, "I'd feel more comfortable with going to the hospital."  He, then, was escorted, with another officer, to the hospital where he was seen for medical attention.

(*Id.*, pp 77-78 PageID.517).  Plug himself acknowledges that when he actually displayed signs of a serious medical problem, the deputy recognized it and sent him to the hospital.  (R. 65-2, Plug Dep, pp 23-24 PageID.456).

Here, in both instances where Deputy Kelly was made aware of Plug's medical needs, he deferred to medical professionals: at booking, Deputy Kelly knew the booking form would be reviewed by the medical staff and that Plug would undergo a medical evaluation; and on October 16, Deputy Kelly consulted with the jail doctor and determined that Plug should be sent to the hospital. Therefore, the district court correctly accepted the magistrate's finding that, in

these circumstances, Deputy Kelly did not act recklessly in the face of an unjustifiably high risk that is either known or so obvious that it should be known.

### b. *Nurse Hickmott*

Nurse Hickmott likewise did not intentionally ignore or recklessly fail to act reasonably to mitigate the risk of Plug's medical needs. Rather, the record establishes that Nurse Hickmott carefully monitored Plug's withdrawal symptoms and appropriately addressed them.

In this circuit, "the simple fact that a medical professional misdiagnosed a patient does not give rise to the level of deliberate indifference, and as a general matter, courts are reluctant to second guess the medical judgment of prison medical officials." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 313 (6th Cir. 2023) (citations omitted). In other words, "negligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014). For example, in *Rouster*, this Court held that a nurse who misdiagnosed a detainee's perforated ulcer as alcohol withdrawal was not deliberately indifferent in part because most of detainee's symptoms were entirely consistent with alcohol withdrawal and because she lacked knowledge that he had been treated for a perforated ulcer the year before. In *Britt v. Hamilton County*, 2022 WL 405847, at *3 (6th Cir. Feb. 10, 2022) this Court held that a nurse who misdiagnosed a detainee's endocarditis as heroin withdrawal was not

deliberately indifferent. The Court noted that the detainee's symptoms were consistent with heroin withdrawal and the only symptoms the nurse observed were that the detainee's "heart rate and temperature were slightly higher than normal," but "they were close to the typical range." *Id.* The Court concluded that "[t]his is far from the kind of unequivocal language from medical experts that would reflect an extreme and obvious risk of endocarditis." By contrast, in *Perez v. Oakland Cnty.*, 466 F.3d 416, 425 (6th Cir. 2006), this Court found a genuine question of material fact existed regarding a prison doctor's subjective awareness of a serious medical risk to a prisoner who committed suicide when the doctor had several times previously placed a prisoner on elevated suicide watch.

Here, like in *Rouster* and *Britt*, there is nothing in the record to demonstrate that Plug was exhibiting symptoms that were entirely consistent with a stroke alone or that Hickmott possessed any additional information about Plug that should have informed her decisions regarding how to treat him. Hickmott testified that she would have seen Plug's intake form (R. 65-4, Hickmott dep, p 35 PageID.481), thus, she would have known that he appeared to be high on methamphetamine and exhibiting Covid symptoms when he was booked. The intake form did not report that Plug was taking medication for high blood pressure, but it did state that Plug did not experience problems with withdrawal. (R. 65-1, Batch Book Form, PageID.446-449).

30

On October 9, Hickmott addressed Plug's complaints of a dry cough and shortness of breath, and he advised that he had been sick two to three days before arriving at the jail. Accordingly, she administered a covid test, but otherwise noted that he had no nasal discharge and no body aches, and he was eating well. She did note, however, that he was not taking in many fluids, so she advised him to increase that. (R. 65-3, Progress Notes, PageID.469-471; R 65-4, Hickmott Dep., pp 64-65, 67-68, PageID.488-489). Although Plug argues throughout his brief on appeal that knowledge of methamphetamine withdrawal should have put Defendants on notice of a heightened risk of stroke, according to his own expert, Hickmott followed the proper course of action. See R. 58-1, Zamorano Report, PageID.322 (stating that methamphetamine withdrawal typically does not require pharmacological treatment but that the treater should "encourage rest, hydration, and nutritional support," and "monitor for depressive symptoms, fatigue or suicidal ideation").

Nurse Hickmott next saw Plug on October 14 to inform him that his covid test was negative. This was the date Plug alleges he suffered a stroke, but Hickmott observed that while he was mumbling some of his words, others were clear and he was alert and following commands. He was otherwise eating all his meals and moving his arms and legs. Hickmott explained she did not notify the doctor that Plug was mumbling because "[h]e wasn't unresponsive," and it is "not

31

unusual for somebody to say clear words and mumble, other times, when they don't open their mouth enough. (R 65-4, Hickmott Dep, p 60 PageID.487). She clarified that in her opinion; it was not that Plug was incapable of being understood when she noted him mumbling but that he just didn't want to open his mouth and answer loud enough for someone to understand. (*Id.*). Thus, Hickmott "didn't see anything that indicated, neurologically that I needed to go any farther than keep observing and monitoring him." (*Id.*)

On October 14, Plug's blood pressure was 142/100 and Hickmott explained that doctors like to see the top number below 160 and the bottom number below 90. (R 65-4, Hickmott Dep, p 74 PageD.491). Thus, on October 15, she was likely checking Plug to follow up on his blood pressure because it was "right on the verge." (*Id.*, p 73 PageID.491). "Most doctors will monitor four or five days. And if it sets in the range of where his blood pressure rating is, we'll get him started on something whether they were taking something in the past or not." (*Id.*). On that date, Plug's blood pressure had decreased somewhat to 140/98. (R 65-3, Nurse Progress Notes, PageID.469-471). He remained alert and responding to verbal commands, and though eating less, he was still eating. Plug was still mumbled at times and sleeping most of the day, but Hickmott explained that sleeping a lot is not uncommon in a prison setting. (R 65-4, Hickmott Dep, p 72 PageID.490).

In sum, Nurse Hickmott was actively engaged with Plug while he was in custody to closely monitor his symptoms and nothing in his reported behaviors could clearly be shown to be undisputedly consistent with a stroke. Therefore, Nurse Hickmott's actions in no way rise to the level of recklessness in the face of an unjustifiably high risk of an obvious harm and the district court correctly concluded that Nurse Hickmott did not act "with the subjective mental state required for a Fourteenth Amendment deliberate indifference claim." (R. 80, Order Regarding R&R, PageID.1057).

**C.    In the alternative, Deputy Kelly and Nurse Hickmott are entitled to qualified immunity.**

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). The Court generally asks two questions to determine whether a government official is entitled to qualified immunity: whether "the plaintiff has shown that a constitutional violation occurred," and whether "the right was clearly established at the time of the violation." *Santiago v. Ringle*, 734 F.3d 585, 593 (6th Cir. 2013). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Id*.

Importantly, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official ***beyond debate***." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal citation and quotation marks omitted; emphasis added). See also *White v. Pauly*, 580 U.S. 73, 79 (2017) ("While this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.") (internal citation and punctuation omitted).

Importantly, courts must not define clearly established law "at a high level of generality since doing so avoids the crucial question whether the official acted reasonably ***in the particular circumstances*** that he or she faced." *Plumhoff* 572 U.S. at 779 (internal citation and punctuation omitted; emphasis added). Finally, "[w]hen the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

It is true that this Court has held "[a]s early as 1972, … that where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional

due process." *Howell*, 67 F.4th at 318 (citation and punctuation omitted). However, the Court considers "comparable circumstances" in the qualified immunity analysis. *Id*. Plug argues this Court's precedent establishes "a consistent rule" that when "officials observe escalating medical deterioration," including neurological symptoms, "and fail to escalate care," and "when seriousness of symptoms is disputed, qualified immunity cannot be resolved as a matter of law." (Pl. Br., pp 16-25).[3] But as the district court correctly concluded, the cases on which Plug relies are distinguishable from the circumstances here and thus they do not clearly establish that Nurse Hickmott or Deputy Kelly violated Plug's clearly established right not to have his known, serious medical needs disregarded by a medical provider or an officer. Rather, in all the relied upon cases, the jail nurses or corrections officers disregarded obvious severe symptoms or had some knowledge regarding the detainee's serious condition. Those cases do not place the constitutional question confronted by Nurse Hickmott and Deputy Kelly beyond debate. Rather, as discussed, *Britt* and *Rouster* establish that any misdiagnosis by Nurse Hickmott amounts to mere negligence not a constitutional violation, and cases such as *Greene* and others discussed below deem it constitutional for Deputy Kelly to reasonably defer to medical staff.

_____

[3] Again, in his analysis, Plug does not distinguish between Deputy Kelly and Nurse Hickmott.

For example, Plug cites *Mercer v. Athens Cnty., Ohio*, 72 F.4th 152, 156-57 (6th Cir. 2023), wherein the detainee immediately exhibited severe symptoms that were not appropriately addressed by the jail nurse, unlike this case, where there were no severe symptoms until October 16 and Nurse Hickmott carefully monitored Plug's condition. In *Mercer*, during booking, the detainee indicated daily heroin use but no other issues. However, the detainee soon fell off a bench, stuck her head, and briefly lost consciousness. The responding officers also informed the nurse that the detainee had been "kind of shaking." When the nurse arrived, however, he examined the detainee and found no evidence to support statements that she had a seizure and hit her head. *Id*. at 157-58. Shortly thereafter, the detainee urinated on herself and was unsteady on her feet. The nurse responded by taking a urine sample, ordering a blood test, and prescribing ibuprofen for the detainee's headache. *Id*. at 158. An hour later, the deputies found the detainee unresponsive and "[a]n autopsy identified the cause of death as seizure activity due to a subarachnoid hemorrhage and subdural hematoma of undetermined etiology." *Id*. at 159.

This Court concluded it was error to grant summary judgment to the nurse in these circumstances, and as additional support for its conclusion, the Court noted that the applicable policy required the nurse to call a doctor or take the detainee to the hospital when there was a loss of consciousness or a seizure. *Mercer*, 72 F.4th

at 159-162. The Court further held that the nurse was not entitled to qualified immunity because based on circuit precedent, he "knew or should have known of a substantial risk of serious harm to [the detainee] because she had lost consciousness, had a headache, had been reported to have had multiple seizures, and had urinated on herself," yet his response was to prescribe ibuprofen and send her back to her cell "rather than calling for a doctor or sending her to the emergency room, which a jury could find was deliberate indifference." *Id*. at 164-165. Nurse Hickmott did not witness any similar symptoms here.

On the other hand, the *Mercer* court found the corrections officers were properly granted summary judgment because, like Deputy Kelly, they "had different training and responsibilities" than the nurse, and they properly performed their duties, provided information to the nurse, and otherwise deferred to the medical professional. This Court explained:

> … Even if the facts known to [the corrections officers] at the time should have indicated that [the detainee's] serious medical needs subjected her to an unjustifiably high risk of harm, both officers testified that they relied on Nurse Gray to decide whether a detainee had a serious medical condition and needed additional assistance, and to handle medical emergencies.

*Mercer*, 72 F.4th at 163. Here, Deputy Kelly reported the symptoms he witnessed on intake – which were less severe than those present in *Mercer* – knowing that the booking form would be reviewed by medical staff and that Plug would undergo a

medical evaluation, and on October 16, when Deputy Kelly observed more troubling symptoms, he called his supervisor and the jail doctor, and ultimately sent Plug to the hospital.

Plug next relies on *Grote,* which again involved obvious symptoms that were ignored by a medical professional. The detainee was arrested for possession of methamphetamine and although the detainee denied he was detoxing, the deputy who booked him noted he was sweating, shaking, and agitated. When those behaviors worsened, the deputy requested a medical assessment. The jail nurse performed an assessment and the detainee informed her that he had taken a half gram of methamphetamine. The nurse was able to get some vital signs but not blood pressure because of the shaking. She told the deputies to keep a close watch on the detainee (who at this point was hyperventilating), and to perform 10-minute check-ins. The nurse concluded that the detainee was detoxing but not overdosing, and she decided the detainee should be taken to a booking cell, where she administrated supplemental oxygen. The deputies conducted their check-ins but the nurse did not check up on the detainee. At some point 20 minutes passed between check-ins and the deputies were alerted that the detainee was suffering a seizure. Three days later, the detainee died of acute methamphetamine intoxication.

The nurse argued that she mistook the detainee's symptoms as "routine withdrawal" and could not have known he would further deteriorate. Again, however, the detainee's severe symptoms – uncontrollable shaking and hyperventilating – unlike Plug's, indicated an obvious need for medical attention. *Grote,* 85 F.4th at 409. The Court contrasted the facts before it with other cases where "the incarcerated person denied ingesting drugs and the defendants' knowledge of whether the person ingested drugs was a critical piece of information necessary to appreciate the medical need. This was so because ***the medical distress was not obvious***." *Id*. at 410 (emphasis added). So again, this contrasts with what Hickmott observed and therefore, *Grote* does not put her on notice that she violated clearly established constitutional rights.

Plug also relies on *Howell*, which facts are not remotely similar to this case. There, the medical staff was aware of a serious diagnosis and severe symptoms, and thus the case does not put Nurse Hickmott on notice that she violated Plug's clearly established rights. Specifically, the nurses were aware that the detainee was afflicted with sickle cell disease and that he took oxycodone for his sickle cell pain, which had worsened after a week of incarceration. On his way to the medical unit at the end of that week, he repeatedly fell to the ground and had to be placed in a wheelchair. As one nurse was examining him, he was moaning and yelling that he was in pain. Moreover, the detainee told them he could not feel his legs. He rated

his leg and back pain as a ten out of ten, and he kept falling out of his wheelchair. The nurse took his vitals and determined that his respiratory rate was abnormal. Even though the nurse knew that pain was the primary symptom of sickle cell disease and that a sickle cell crisis can manifest as numbness in the legs, she nevertheless determined that the detainee was experiencing a psychiatric issue and recommended a psychiatric evaluation. The detainee was placed in a restraint chair in the psychiatric unit. At that time the detainee's blood pressure was 90/56. A nurse checked on him about 25 minutes later. The detainee was still yelling but she did not recommend any further treatment. No healthcare employee checked on him again. Approximately four hours after being placed in the chair, the detainee was found dead.

This Court held that, under those circumstances, the nurse's misdiagnosis of a psychiatric episode did not prevent a finding of deliberate indifference because despite the above-described facts and the nurse's knowledge of sickle cell disease, she "never took further action to rule out a sickle cell crisis." *Howell*, 67 F.4th at 312-13. The Court thus found a question of fact regarding "whether and to what degree [the detainee's] symptoms were inconsistent with a psychiatric episode and were instead consistent with a sickle cell crisis." *Id*. at 313.

*Est. of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005), which involved a law enforcement officer, is likewise inapposite, because that officer,

unlike Deputy Kelly, did not respond to obvious and severe symptoms of a heart attack, which even a lay person would know required medical attention. In *Carter*, when the detainee was arrested, she told the officers she was having chest pains and had been without her heart medication for three days. Other detainees testified that she "cried loudly for help and continued to complain that her chest hurt and that she needed to go to the hospital, and may have even been lying on the floor of the cell ..." *Id*., at 307. But the defendant officer "made no entries into the precinct's 'blotter' detailing [the detainee's] complaints or the fact that he allegedly ordered [another officer] to transport [the detainee] to the hospital," and regardless, he knew she was still there when he left. *Id*. at 307-308. The officer also forgot to tell his relief that the detainee was ill. *Id*. at 308. Later, another officer making rounds spoke to the detainee, who reported that she was ill and had not taken her medication. That officer called for a car to take the detainee to the hospital, but before the car arrived, the detainee was found unconscious on the floor of her cell. Her death was later determined to have been caused by a heart attack. This Court held that the defendant office knew the detainee "was exhibiting the classic symptoms of an impending heart attack, knew she had cried for help, and believed that she was three days behind in taking her heart medication. His failure to order transportation to take [the detainee] to the hospital violated [the detainee's] clearly established right to adequate medical treatment[.]" *Id*. at 310.

Finally, *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593 (6th Cir. 2022), which also involved corrections officers, is again distinguishable because, like in *Carter* but unlike this case, when the detainee was booked into the county jail, he soon began exhibiting severe symptoms, and specifically, "hallucinating and … other symptoms of delirium tremens, a life-threatening complication of alcohol withdrawal," which this Court has "long recognized is an objectively serious medical need." *Id*. at 598. The detainee suffered acute respiratory failure on the fifth day, and died four days later. In that case, despite having received training that severe alcohol withdrawal marked by symptoms such as confusion and hallucinations was a medical emergency, the defendant corrections officers "did not provide any medical care to [the detainee] prior to his incapacitation. Instead, they sought only a mental health evaluation … and purportedly relied on that evaluation in deciding not to seek medical assistance." *Id*. at 599. Moreover, even after the recommendation from the mental health care professional, the detainee continued to suffer from severe hallucinations, for which no medical attention was sought. *Id*. at 609. The Court thus found a jury question as to whether the corrections officers "recklessly failed to act with reasonable care" in failing to render or seek any basic medical assistance for [the detainee] while he continued to suffer from delirium tremens following [a] mental health evaluation." *Id*. Here again, Deputy Kelly referred Plug to medical providers after both encounters

where Plug was demonstrating a need for evaluation or treatment but with far less severe symptoms.

In sum, none of the cases upon which Plug relies, including *Mercer*, *Grote*, *Howell*, *Carter*, or *Greene*, provide notice to Nurse Hickmott or Deputy Kelly that their conduct violated Plug's clearly established constitutional rights, and therefore, they are entitled to qualified immunity.

**THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF THE MUNICIPAL LIABILITY CLAIMS.**

"A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, Ohio, 903 F.3d 553, 565 (6th Cir. 2018), citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)). "The scope of that responsibility does not include respondeat superior liability: a municipality is liable only for its own wrongdoing, not the wrongdoings of its employees." *Id.*

Accordingly, a "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citation and punctuation omitted). A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of his rights. *Monell*, 436 U.S. at 694. "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

**A. The County does not have an unconstitutional policy.**

In his complaint and arguments in the district court, Plug argued the County has an illegal policy that denied proper medical care to detainees withdrawing from methamphetamines and a failure to train and supervise jail staff and Nurse Hickmott. (See R.1, Complaint, ¶¶ 19, 49-55 PageID.6, 12-13; R. 69, Response to MSJ, PageID.552-566). On appeal, Plug focuses his arguments on an alleged failure to train staff to recognize neurological deterioration in known amphetamine users. (Pl. Br., pp 31-35). This narrower focus is likely because, as Plug's argument on appeal makes clear (he characterizes his position as "a single-incident obvious risk theory"), a claim based on a custom or policy of inaction would fail on the first element. As this Court has recently explained:

> To succeed on a municipal-liability claim under an "inaction" theory, a plaintiff must show "(1) the existence of *a clear and persistent pattern* of" unconstitutional conduct; (2) "notice or constructive notice" on the part of the municipality; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) "that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation."

*Franklin v. Franklin Cnty., Kentucky*, 115 F.4th 461, 472 (6th Cir. 2024) (citation omitted). Here, Plug pointed to no other incident of a stroke being misdiagnosed or even of withdrawal symptoms allegedly being mishandled and indeed, no such evidence exists. Therefore, his claim of a custom or policy of denying proper medical care to detainees suffering from withdrawal fails as a matter of law. See

45

*Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) ("There is no record of [the jail's contract medical provider] providing constitutionally inadequate medical care to inmates in the past, let alone that the County was constructively aware of and thus tacitly approved such hypothetical unconstitutional conduct.")

Moreover, the policy the County *has* implemented is constitutional.

[T]his court has made clear that it is not "unconstitutional for municipalities and their employees 'to rely on medical judgments made by [private] medical professionals responsible for prisoner care[,]' " *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004), a holding that necessarily leads us to conclude that a municipality may constitutionally contract with a private medical company to provide healthcare services to inmates.

*Winkler*, 893 F.3d at 901 (emphasis added). See also *Medley v. Shelby Cty.*, 742 F. App'x 958, 962 (6th Cir. 2018) ("[A] County may constitutionally contract with a private medical company to provide healthcare services to inmates and plaintiff offers no evidence that outsourcing inmate medical care raises an obvious risk to inmates' constitutional rights to adequate medical care."). The Court has recognized the benefits of such a policy, noting that "[n]ot only does such a policy … allow prisoners to receive prompt health care from on-site doctors or nurses, it also ensures that an independent party, rather than a corrections officer, makes the critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted." *Graham*, 358 F.3d at 384 (citation omitted). See also *Brawner*, 14 F.4th at 600 (the

defendant's custom of using non-medically trained booking officers to perform initial screenings of pretrial detainees did not violate the Fourteenth Amendment because it was the county's custom for the booking officer to provide a copy of the questionnaire to a nurse for medical review).

Sheriff Abbott explained that under the contract with the health care provider, nurses are in the jail from 7:00 am to 9:00 pm, and a doctor is on call 24 hours a day, seven days a week. (R. 69-8, Abbott Dep, pp 16, 45 PageID.914, 943). See also *id*., pp 21-22 PageID.919 (acknowledging Policy No. 28, Inmate Healthcare, which is to provide appropriate emergency and nonemergency medical treatment to an inmate who is injured or suffering an illness and Policy 63, which states that an inmate should receive a health appraisal within 14 days); *id*. at pp 24-27, 31 PageID.922-925, 929 (inmates who are under the influence or drugs, and methamphetamine in particular, typically are placed in the observation cells or detox cells, and it they are not coherent when during booking, or there otherwise appears to be a health risk, the inmates are sent to the emergency room). Nurse Hickmott further explained that the doctor comes to the jail once a week "to review charts and see anybody that we deem they need to see …." (R. 65-4, Hickmott Dep, pp 16-17 PageID.476-477).

Importantly, even should the conduct of Deputy Kelly or Nurse Hickmott be found negligent in this instance – and it should not be, as held by the district court

and explained in Argument I – such a finding would not negate the constitutionality of the County's policy.  See *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 384-85 (6th Cir. 2004) (A municipal policy cannot be the "moving force" behind an injury resulting from … "an otherwise sound program [that] has occasionally been negligently administered.").

**B.    The County is not liable for a failure to train.**

A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  This Court follows a three-part test which instructs that "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 286-87 (6th Cir. 2020) (citation omitted).

Plug contends is he now proceeding under "a single-incident obvious-risk theory."   (Pl. Br. pp 30-31).   Plug relies on his expert's opinion that methamphetamine use "significantly heightens stroke risk and requires heightened vigilance in recognizing neurological symptoms," and Plug concludes that a reasonable jury could find that relevant training and protocols were necessary and that the failure to implement or enforce "such escalation mechanisms" creates a

highly predicable risk of constitutional injury. (*Id.*, p 32). In other words, Plug seeks to show that the County "has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.'" *Helphenstine*, 60 F.4th at 323, quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015). See also *Meirs v. Ottawa Cnty.,* 821 F. App'x 445, 454 (6th Cir. 2020) (internal citation and punctuation omitted) ("[]A county can be held liable for lack of appropriate training … when in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.")Plug cannot succeed on his claim because the nursing staff and corrections officers were trained to respond to medical emergencies, as demonstrated by the facts of this case.

### 1. Nurse Hickmott

Nurse Hickmott first generally explained how she was trained to provide medical care to inmates. A physical for an incoming detainee has to be completed within 14 days, so Nurse Hickmott reviews the intake form and then determines if the inmate needs to be seen sooner. (R. 65-4, Hickmott Dep, pp 13, 26 PageID.475, 479). Issues that would speed up the process would be certain medical diagnoses, whether the inmate is on certain medications, or if the inmate

says he takes medication but does not have it with him. (*Id.*, p 27 PageID.479). If inmates have a complaint, she sees them and takes their vital signs. She then calls the doctor to discuss what the complaint is and her observations. (*Id.*, p 25 PageID.479). She testified that she could call the on-call doctor every day if she needed to, and if a person came in with medication, "we always have the doctor approve whatever medications came in." (*Id.*, pp 14, 17 PageID.475, 477).

As to withdrawal specifically, Nurse Hickmott explained that she would check on a person in a detox cell once or twice a day, depending on the reason for being placed in the detox cell. (R. 65-4, Hickmott Dep, p 14 PageID.475). Additionally, Nurse Hickmott knew that, after 24 hours, there can be signs of methamphetamine withdrawal, such as sweating, nausea, and maybe anxiety, though each person is different. (*Id.*, pp 51, 65 PageID.485, 489). There is a detox protocol for methamphetamine users, and medication that can be prescribed by a doctor for methamphetamine withdrawal, but in this particular case, she did not believe the symptoms Plug was showing met the criteria for detox placement or medical observation. (*Id.*, pp 51, 56, 59 PageID.485-487).

Nurse Hickmott further testified that she is trained to identify symptoms of stroke, including aphasia, mental status change, severe fatigue, and incontinence. (R. 65-4, Hickmott Dep., p 75 PageID.491). She also acknowledged that neurological symptoms are required to be "escalated" to a physician. (*Id.*, p 60

50

PageID.487).  Again here, Hickmott did not contact the doctor on October 14 or 15, 202, because Plug was not unresponsive, and she found him to be mumbling as distinguished from slurring his words.  (*Id.*, pp 60, 62 PageID.487-488).  She never saw him urinate on himself nor was it noted on the intake form.  (*Id.*, pp 62-63, 78 PageID.488, 492).  Also, she did not find it unusual for inmates to sleep a lot because they do not have anything else to do. (*Id.*, p 72 PageID.490).  Otherwise, she recorded all his symptoms.  (*Id.*, p 73 PageID.491).

Clearly then, Nurse Hickmott was properly trained to provide medical care to the jail's inmates, including inmates in detox or exhibiting neurological symptoms, and to escalate the response when needed by contacting the jail doctor. And again, even should she be determined to have acted negligently in the case, and she should not be, the County is not liable for a failure to train its medical staff.  See e.g., *Brawner*, 14 F.4th at 600 ("to the extent the booking officer incorrectly recorded answers [on the booking sheet] or failed to contact the medical staff, that at most reflects negligent conduct, not conduct attributable to a [] County policy.").

### 2.    Deputy Kelly

Deputy Kelly was properly trained to obtain medical information from detainees at booking and to otherwise defer to the medical staff for proper treatment.

When Plug was booked into the jail, Deputy Kelly, as he was trained to do, filled out a detailed medical history, which involved making observations and taking information from Plug. (R. 65-5, Kelly dep, pp 47-49, PageID.509-510). This information is reviewed by the medical staff, and generally, an alert would be created when the incoming detainee had a medical concern like high blood pressure or was on certain medications. (R. 69-8, Abbott Dep, p 41 PageID.939).

Sheriff Abbott also explained that, although a person coming into the jail high on methamphetamine is a common occurrence, if the person appears to be incoherent or otherwise having a medical emergency, he would not be booked into the jail but instead would be sent to the emergency room. (R. 69-8, Abbott Dep, pp 24-27, 30-31, 39, 57-58 PageID.922-925, 937, 955-956). Sheriff Abbott also acknowledged specific training given to corrections officers on withdrawal related to alcohol and opiates. (*Id.*, pp 35 PageID.933)

Sheriff Abbott further explained that, while a person's level of alcohol intoxication can be measured, the same is not true of methamphetamine or other drugs. (R. 69-8, Abbott dep, pp 29-30 PageID.927-928). But corrections officers are trained to look at pupils, and here, Deputy Kelly noted on Plug's intake form that he appeared to be under the influence of drugs or alcohol. (*Id.*, p 30 PageID.928; R. 65-1, Batch Book Form, PageID.446). In fact, as Plug acknowledged in his response to Defendants' motion, Deputy Kelly was aware of

52

the signs of being under the influence or withdrawing from meth. (R. 69, Response, PageID.544, citing R. 65-5, Kelly Dep, p 52 PageID.510). A person that is high is put in an observation cell, as was done in this case. (R. 69-8, Abbott Dep, PageID.953).

The deputies are also taught basic CPR. (R. 65-4, Hickmott Dep, p 26 PageID.479). While Deputy Kelly did not remember all the additional training he received, he explained he was trained that if there were medical concerns, he should "let the jail, and medical staff, and your sergeant be aware of it, and explain to them what's going on, and have them talk to whoever is having the medical issue." (R. 65-6, Kelly Dep, pp 24-25). Similarly, Sheriff Abbott testified that if inmates started exhibiting symptoms like slurred speech or urinating on themselves, medical staff should be summoned immediately, or staff should call an ambulance. (R. 69-8, Abbott Dep, pp 30-31, 45-46 PageID.929, 943-44). Both corrections officers and nurses have the ability to refer an inmate to a doctor or hospital, especially if time is of the essence. (*Id*., p 43 PageID.941).

That is exactly what occurred in this case. Deputy Kelly testified that Plug spoke to him on October 16, 2020, complaining of an illness, and after removing Plug from his cell, Deputy Kelly "realized there was a medical issue." (R. 65-5, Kelly Dep., pp 77-78 PageID.65-5). When he could not reach his supervisor, Deputy Kelly informed the on-call doctor of his observations and agreed that he

would feel more comfortable if Plug were sent to the hospital.  (*Id.*)  Accordingly, any failure to train claim based on Deputy Kelly's training fails as a matter of law and the district court's order granting summary judgment to the County should be affirmed.  See *Helphenstine*, 60 F.4th at 324 ("[J]ailers trained in CPR and first aid received adequate training to respond to medical emergencies," where, like this case, "the jail had trained medical staff on site forty hours per week, and medical staff was 'available to jail personnel, either in person or by phone, for consultation about an inmate 24 hours a day, 7 days a week.'"); *Grote*, 85 F.4th at 415-416 ("[W]here officials are trained to recognize medical issues and have access to and do access medical providers, we have not held that a lack of more specific training with respect to medical issues presents an obvious risk of a constitutional violation."); *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *7 (6th Cir. Nov. 8, 2024) (citing *Grote* and holding "[a] County and its officials do not act with deliberate indifference where, as here, they reasonably defer to a medical professional's treatment decisions.")

## CONCLUSION

For the reasons set forth herein, Defendants-Appellees, Dillon Kelly, Roslynn Hickmott, Sheriff Daniel Abbott, and Van Buren County, respectfully request this Court affirm the district court's order granting their motion for summary judgment, and grant Defendants-Appellants all other relief to which they are entitled.

Respectfully submitted,

PLUNKETT COONEY

By: */s/Josephine A. DeLorenzo*
JOSEPHINE A. DELORENZO
38505 Woodward Ave, Suite 100
Bloomfield Hills, MI 48304
Tel: (313) 983-4338
jdelorenzo@plunkettcooney.com

*Attorney for Defendants-Appellees*
*Van Buren County, MI, Sheriff Daniel*
*Abbott, Deputy Dillon Kelly*
*and Nurse Roslynn Hickmott*

Dated: April 21, 2026

# CERTIFICATE OF COMPLIANCE

STATE OF MICHIGAN )
) ss.
COUNTY OF OAKLAND )

Josephine A. DeLorenzo, being first duly sworn, certifies and states the following:

1.  She is an attorney with the firm Plunkett Cooney, and is in principal charge of the above-captioned cause for the purpose of preparing the attached brief on appeal;

2.  The brief on appeal prepared by her office complies with the type-volume limitation, using Times New Roman size 14 font; and

3.  The word processing system counts the number of words in the brief as 12,808.

*/s/Josephine A. DeLorenzo*
JOSEPHINE A. DELORENZO
38505 Woodward Ave, Suite 100
Bloomfield Hills, MI 48304
Tel:  (313) 983-4338
jdelorenzo@plunkettcooney.com

*Attorney for Defendants-Appellees*
*Van Buren County, MI, Sheriff Daniel*
*Abbott, Deputy Dillon Kelly*
*and Nurse Roslynn Hickmott*

## CERTIFICATE OF SERVICE

Josephine A. DeLorenzo, being first duly sworn, deposes and says that she is a Shareholder with the Firm of Plunkett Cooney and that on the 21st day of April, 2026, she caused a copy of this document to be served upon all parties of record, and that such service was made electronically upon each counsel of record so registered with the Sixth Circuit Court of Appeals and via U.S. Mail to any counsel not registered to receive electronic copies from the court, by enclosing same in a sealed envelope with first class postage fully prepaid and depositing said envelope and its contents in a receptacle for the U.S. Mail.

*/s/Josephine A. DeLorenzo*
JOSEPHINE A. DELORENZO
38505 Woodward Ave, Suite 100
Bloomfield Hills, MI 48304
Tel: (313) 983-4338
jdelorenzo@plunkettcooney.com

*Attorney for Defendants-Appellees*
*Van Buren County, MI, Sheriff Daniel*
*Abbott, Deputy Dillon Kelly*
*and Nurse Roslynn Hickmott*

# ADDENDUM – DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RECORD ENTRY | DATE | DESCRIPTION | PageID # |
|---|---|---|---|
| 1 | 10/5/23 | Plaintiff's Complaint and Jury Demand | 1-15 |
| 58 | 5/8/25 | Plaintiff's Motion to Permit the Testimony of Dr. John Peters, Ph.D. | 294-306 |
| 58-1 | 5/8/25 | Exhibit 1 to Plaintiff's Motion to Permit the Testimony of Dr. John Peters, Ph.D. | 307-324 |
| 58-2 | 5/8/25 | Exhibit 2 to Plaintiff's Motion to Permit the Testimony of Dr. John Peters, Ph.D. | 325-326 |
| 58-3 | 5/8/25 | Exhibit 3 to Plaintiff's Motion to Permit the Testimony of Dr. John Peters, Ph.D. | 327-346 |
| 65 | 5/30/25 | Brief in Support of Defendants' Motion for Summary Judgment | 417-442 |
| 65-1 | 5/30/25 | Exhibit 1, Batch Book Form, to Brief in Support of Defendants' Motion for Summary Judgment | 443-449 |
| 65-2 | 5/30/25 | Exhibit 2, Dep of Nicholas Cory Plug, to Brief in Support of Defendants' Motion for Summary Judgment | 450-467 |
| 65-3 | 5/30/25 | Exhibit 3, Progress Note, to Brief in Support of Defendants' Motion for Summary Judgment | 468-471 |
| 65-4 | 5/30/25 | Exhibit 4, Dep of Roslyn Hickmott, to Brief in Support of Defendants' Motion for Summary Judgment | 472-496 |
| 65-5 | 5/30/25 | Exhibit 5, Dep Dillon Kelly, to Brief in Support of Defendants' Motion for Summary Judgment | 497-521 |
| 65-6 | 5/30/25 | Exhibit 6, Jail Policy, to Brief in Support of Defendants' Motion for Summary Judgment | 522-524 |
| 69 | 7/9/25 | Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 531-570 |
| 69-1 | 7/9/25 | Index of Exhibits | 571 |
| 69-2 | 7/9/25 | Exhibit 1, Jail File Excerpts, to | 572-582 |

| RECORD ENTRY | DATE | DESCRIPTION | PageID # |
|---|---|---|---|
| | | Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | |
| 69-3 | 7/9/25 | Exhibit 2, Nicholas Plug Dep, to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 583-647 |
| 69-4 | 7/9/25 | Exhibit 3, Medical Records, to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 648-680 |
| 69-5 | 7/9/25 | Exhibit 4, Kimberlee Plug Dep, to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 681-708 |
| 69-6 | 7/9/25 | Exhibit 5, Kelly Dep, to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 709-803 |
| 69-7 | 7/9/25 | Exhibit 6, Hickmott Dep, to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 804-897 |
| 69-8 | 7/9/25 | Exhibit 7, Abbott Dep, to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF 64, 65) | 898-959 |
| 72 | 8/1/25 | Defendants' Reply in Support of Motion for Summary Judgment | 976-990 |
| 75 | 10/23/25 | Report and Recommendation | 999-1028 |
| 76 | 11/6/25 | Defendants' Objections to Report and Recommendation (ECF No. 75) | 1029-1037 |
| 78 | 11/6/25 | Plaintiff's Objection to Report and Recommendation (ECF No. 75) | 1039-1050 |
| 80 | 11/26/25 | Order Regarding Report and Recommendation | 1055-1063 |

62421414.1